# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

December 1, 2022

**Via ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re.   **United States v. Christopher Davalos**
      **22 Cr. 45 (PGG)**

Dear Judge Gardephe,

In the fall of 2020, Christopher Davalos's life was in crisis. Recently released from a psychiatric hospitalization after suffering a breakdown, Mr. Davalos was unemployed, homeless, self-medicating with illicit substances, and on the verge of losing custody of his daughter. In a tailspin, he made the terrible decision to be a lookout for others who robbed a bodega.

After this incident, yet months before his arrest, Mr. Davalos committed to turning his life around. Having been a product of the foster care system after he was abused and abandoned by his teenage mother as an infant, Mr. Davalos resolved to do everything in his power to reunite with and be a better parent to his daughter. Working closely with the Administration for Children's Services, he engaged all of the services they offered him: mental health treatment, substance abuse treatment, drug testing, anger management, and parenting skills development. Even after his arrest in this case, because Mr. Davalos was given a chance to remain in the community on bail, he redoubled his efforts to live a productive, law-abiding life. He continued with his supportive programming and counseling, worked when offered employment from his temp agency, and otherwise performed exceptionally well under the supervision of Pretrial Services. As he approaches sentencing, more than two years since the conduct at issue and after nearly a year and a half of exemplary conduct while on bail, Mr. Davalos stands at a crossroads. He asks for the Court's mercy so he can continue down his current, positive path.

As described below, because Mr. Davalos has successfully completed all the counseling, classes, and other actions mandated by Family Court and ACS, he is on the verge of regaining custody of his daughter. Because he has worked diligently with service providers affiliated with the Department of Homeless Services, he has received a housing voucher and is prepared to move into his own apartment for the first time. And because he took to heart the trust that the Court placed in him to succeed during his time on bail, he is able to point to a lengthy record of lawful, productive behavior in the community when given the proper support.

**United States v. Davalos**
**22 Cr. 45 (PGG)**

In light of Mr. Davalos's extraordinary efforts to turn his life around, including the efforts described above and his full compliance with pretrial supervision, as well as the relationship between Mr. Davalos's previously untreated mental health issues, unstable housing, and unlawful conduct (all of which are being productively addressed), we ask the Court to exercise its broad discretion at sentencing to allow Mr. Davalos to continue to receive necessary services and support in the community and not be subjected to incarceration and the devastating consequences that would flow from imprisonment. Specifically, we respectfully request that the Court sentence Mr. Davalos to the maximum term of five years of probation or three years of supervised release, with strict conditions of compliance to include substance abuse treatment and drug testing, mental health treatment, verified employment, and a period of community service.

We do not request this sentence lightly. But, in this unique case, the requested sentence would most effectively advance the statutory goals of sentencing under section 3553(a), while allowing Mr. Davalos to maintain the positive momentum he has built up over the past two years and to reunite with his daughter. The support he has received during this time has been immensely helpful in stabilizing Mr. Davalos and putting him in a position to succeed. Ongoing support from the Probation Department will ensure that he continues to receive the services he needs moving forward, which directly address the root causes of his prior unlawful conduct. Should Mr. Davalos run afoul of any of the obligations the Court may impose on him, Mr. Davalos could have his probation or supervised release revoked and be re-sentenced by the Court up to the statutory maximum limits. In sum, the requested sentence would account for the admirable strides Mr. Davalos has made, while imposing punishment that is sufficient, but not greater than necessary, for this person in this case.

I.      **Christopher's Heartbreaking Struggles with Abandonment, Intellectual Disabilities, Homelessness, and Mental Illness**

Mr. Davalos was born Christopher Pacheo to a 17-year old mother who had run away from her family at the age of 13 and had already given birth to an older sibling at age 14. (PSR ¶ 39, Ex. B, Ltr. from J. Tejera.) Christopher was born ███████████████ and remained in the hospital for eight days after his birth. (Ex. G at 1.) Christopher's records reflect that his mother's pregnancy with him was complicated. (Ex. G at 1.)

Christopher was raised primarily under the auspices of the New York City child welfare system after he was abandoned by his mother shortly after his birth. Christopher's mother not only abandoned him, but during the brief time they spent together, she attempted to throw him out of an apartment window. (PSR ¶ 39.) Over the subsequent years, Christopher tried to form a relationship with his birth mother, but she has continually rejected his outreach. (Ex. B, Ltr. from J. Tejera.) His father was deported from the country when Christopher was an infant. (PSR ¶ 39.) Although Christopher later connected with his father around the age of 20, neither parent was around or provided him any support in his childhood. This absence had devastating effects.

2

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Christopher was placed in the foster care of his great-grandmother, Antonia Davalos. (PSR ¶ 40.) Ms. Davalos only spoke Spanish and her home was often filled with many other extended family members, including half-siblings of Christopher's (who his mother also abandoned) and various cousins, aunts, and uncles. After approximately seven years in the kinship foster care program, Christopher was adopted by his great-grandmother and his name was changed to Christopher Davalos.

While Christopher recalls that his great-grandmother worked hard to provide basic necessities for him and his half-siblings, it was not a loving or nurturing environment in which to grow up. (PSR ¶ 40.) As Christopher describes it, he never felt the love one should receive from their parents. Outside of the school setting, Christopher was often left to watch TV or play by himself. Given the language barrier with his great-grandmother, a young Christopher often could not communicate his needs and desire for basic affection. Christopher's grandmother describes the household as "chaotic." (Ex. C, Ltr. from M. Rodriguez.)

The challenges of this environment were compounded by health ailments Christopher faced, including ██████████████████████████████████ ██████ (Ex. G.) In addition, Christopher suffered from learning disabilities, which manifested primarily as deficiencies in cognition, reading, writing, and communication skills.

After his pediatrician noted delayed developmental milestones, Christopher was referred to what was then known as the Shield Institute for the Mentally Retarded and the Developmentally Disabled. (Ex. G at 1.) For several years, the Shield Institute provided Christopher with special education programming, speech pathology intervention, and counseling. Psychological and intellectual functioning evaluations confirmed Christopher's deficits, with functional age equivalents many years behind his actual age, and the educational attainment and intellectual functioning deficits growing as he got older. Records reflect, for example, that Christopher was in the first percentile in reading and writing/spelling, with intellectual functioning bordering on intellectual disability. (Ex. G at 10, 11, 13, 14.)

In the New York City public school system, Christopher was placed in special education classes on an individualized education plan. Contemporaneous evaluations from the Board of Education reflect Christopher's ongoing struggles with cognition, communication, and language skills, which hampered his educational attainment. (Ex. G at 14.) Christopher was unfortunately unable to overcome his developmental and learning disabilities, and he dropped out without graduating high school. Christopher didn't learn to read until he was an adult. (PSR ¶ 53.)

As a teenager, without the structure of school or close parental guidance, Christopher struggled mightily. He was effectively homeless and resided with friends, in shelters, and on the couches of strangers. (PSR ¶ 46.) He became involved in a relationship in his teens, which produced a child, but the mother of his son was abusive to Christopher and ultimately moved with the child to Pennsylvania and precluded contact with Christopher. (Ex. B, Ltr. from J.

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Tejera.) Christopher lost contact with his son, and it pains him deeply that his son is growing up without his father, just like Christopher did. (PSR ¶ 43.)

As he aged, outside his incarceration, Christopher worked for temp agencies, in manual labor jobs, and for employment services. He continued to struggle to find steady employment and his mental illness went untreated or self-medicated with illicit substances. (PSR ¶¶ 62, 63.)

In 2018, Christopher started a relationship with Aaliyah Burnette. The couple had a daughter, ████ in December 2018. (PSR ¶ 44.) Christopher and Aaliyah, who also resided in the shelter system, faced tremendous challenges. First and foremost, they struggled to find housing that could accommodate their family. The enormous pressure of raising a daughter while separated in the shelter system, while also trying to find gainful employment to support the family and battling untreated mental illness, finally overwhelmed Christopher.

In mid-2020, Christopher was hospitalized in a psychiatric unit after he began exhibiting concerning behaviors. Although never given a formal diagnosis, Mr. Davalos describes experiencing a "breakdown." Child Protective Services and ACS became involved in the fall of 2020 when Mr. Davalos was observed acting erratically in public. In late September 2020, ████ was placed in foster care. (PSR ¶ 44.)

## II.    The Offense Conduct

By the fall of 2020, Mr. Davalos's life was in freefall. He was homeless, unemployed, struggling with untreated mental illness, recently suffered a breakdown, was facing the prospect of losing his daughter, and was estranged from his partner. With no stability or support and with nothing positive to hold onto, on November 22, 2020, Mr. Davalos made the terrible decision to act as a lookout while two other people robbed a bodega in the Bronx. Although Mr. Davalos did not possess a weapon, did not hold anyone up, and did not personally threaten anyone, he has readily acknowledged, apologized, and is deeply remorseful for his conduct that night.

## III.    Mr. Davalos's Admirable Efforts To Turn His Life Around

Mr. Davalos was not arrested until August 31, 2021. Months before his arrest, however, Mr. Davalos had committed to getting his life on track, by dedicating himself to the program set out by Family Court and ACS. This included getting the mental health and substance abuse treatment he needed, utilizing support systems that were offered to him, and living a productive, law-abiding life. As Ms. Burnette describes, "[s]ince we became involved with ACS in 2020, Christopher has worked to be a better person. He's become focused on what he can to do create the right environment and be reunited with our daughter." (Ex. A, Ltr. from A. Burnette.)

With the guidance and support of Good Shepherd Services in the Bronx, Mr. Davalos enrolled in, and successfully completed, anger management and parenting classes through

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Success Counseling Services. (Exs. H, I.) He also enrolled and successfully participated in substance abuse treatment, with no failed drug tests throughout his entire treatment. (Ex. J.)

Mr. Davalos also engaged in sustained mental health treatment for the first time in his life, through the Nathaniel Clinic, where he was diagnosed with ██████████████████ ████████████████████████ As his therapist reports in her letter to the Court:



(Ex. F, Ltr. from P. Green.)

Before his arrest, Mr. Davalos had secured employment with Stanley Ruth Air Conditioning, where his supervisor raved about Christopher's work ethic and commitment during the time he was employed there. (Ex. E, Ltr. from JT Lewis.) (Mr. Davalos lost this employment when he was detained and missed several days of work before the conditions of his release were satisfied.) As his supervisor describes, given his hard work and commitment, Christopher "probably would have become a permanent employee by now if it weren't for his case." (*Id.*) This former boss notes that he would be happy to rehire Mr. Davalos. (*Id.*)

After his arrest, Mr. Davalos did not give up. Instead, he redoubled his efforts to prove to Family Court and ACS that he should be reunited with his daughter. Even while subjected to location monitoring, curfew, and strict Pretrial Services supervision, Mr. Davalos continued to work temporary employment jobs and complete all the necessary actions that were required of him by Family Court. The results have been plain to see. As Ms. Burnette relates to the Court:

Christopher is a great dad. He's very kind with ██████ and loves to take her out everywhere. They go to the park, stores, and Christopher has been picking her up from school every day for a while, on top of their weekend visits. He just tries to be with her whenever he can. One time, Christopher planned a trip to the aquarium. Our daughter was so excited to see all the animals and spend the day with her dad. She was so excited and appreciative. He's incredibly determined and passionate, and is such a caring person with her especially. (Ex. A, Ltr. from A. Burnette; *see also* Ex. C, Ltr. from M. Rodriguez.)

██████████ current guardian similarly extolls Christopher's parenting:

<u>United States v. Davalos</u>
22 Cr. 45 (PGG)

> His daughter loves him so much, and Christopher is very into spending time with
> ████ I used to supervise Christopher's visits with her at the park and he's
> always right there next to her. He won't even let her slide down a slide without
> holding her hand, which I think is so funny. I tell him that he has to let go of her
> hand and let her play, but he worries about ████ getting hurt. She's fearless;
> she'll always climb the highest thing she can find. I see the other parents at the
> park, and a lot of them sit down and stop paying attention to their kids and go on
> their phones, but Christopher is right with her for the whole two hours that he
> gets. . . . He now takes her and picks her up from school and has his own visits
> without supervision. ████ is always so excited to spend time with her father and
> I see the bond they are developing. (Ex. D, Ltr. from M. Burnette.)

In recognition of Mr. Davalos's progress, Family Court and the foster care agency have
progressively lifted restrictions on his visitation with ████—from supervised visits, to
unsupervised visits, to unsupervised overnight visits. Mr. Davalos has been visiting with ████
overnights on weekends with positive progress for months now. As Mr. Davalos's Family Court
lawyer has explained to the undersigned, weekend overnight visitation is generally the last step
before a child is physically reunited with her parent. Should Mr. Davalos be permitted to remain
in the community, his daughter may be released to his care before the end of the calendar year.

This Court and Pretrial Services have also noted Mr. Davalos's positive efforts. Pretrial
Services consented to, and even recommended, the loosening of restrictions on Mr. Davalos,
culminating in the defense request that the Court remove Mr. Davalos's location monitoring
condition entirely. With the Government's consent, the Court ordered this relaxation of
conditions more than six months ago. (Doc. 27.) Even after Mr. Davalos entered a guilty plea,
which would ordinarily result in detention, the Court found that Mr. Davalos's performance on
pretrial supervision presented clear and convincing evidence that he was not a risk of flight or
danger to the community, and ruled that his ongoing efforts to complete the program Family
Court set out for him and reunite with his daughter were exceptional circumstances justifying his
continued release on bail. (*See* Doc. 34, Tr. 22:1–23:10.)

Mr. Davalos took to heart the trust that the Court placed in him at the time of his plea
hearing. (*See id.* at 23:11–24:6.) He remains fully compliant with the terms of his pretrial
release.[1] He has continued to successfully complete all that is asked of him by ACS and Family
Court. Mr. Davalos has most recently been working seven days a week, six hours a day, in a
maintenance role at a commercial real estate property. He has received a housing voucher that
would permit him to finally leave the shelter system and live in his own apartment for the first
time in his life. Should he be permitted to remain in the community, Mr. Davalos intends to

---

[1]    Defense counsel understands that Mr. Davalos's Pretrial Services Officer stands ready to
answer any questions from the Court about his performance on pretrial supervision.

United States v. Davalos
22 Cr. 45 (PGG)

secure housing for himself and his daughter, while seeking permanent employment free of the cloud of future incarceration.

## IV.    Mr. Davalos's Guilty Plea, the Parties' Plea Agreement, and the Advisory Sentencing Guidelines Range

On July 25, 2022, pursuant to a plea agreement, Mr. Davalos pleaded guilty to one count of conspiracy to commit Hobbs Act robbery. Pursuant to the terms of the plea agreement, Mr. Davalos is in Criminal History Category III and his Total Offense Level is 22, yielding an advisory Sentencing Guidelines range of 51 to 63 months' incarceration. The Probation Department agrees with the parties' Guidelines calculation. (PSR ¶ 69.)

## V.    Probation Recommends A Significant Downward Variance

The Probation Department correctly recognized that sentencing Mr. Davalos to four or five years of incarceration would be far more punitive than necessary. (PSR at 17.) Probation identified the extremely difficult socioeconomic conditions in which Mr. Davalos was raised, and his childhood struggles with learning and intellectual disabilities and lack of parental love. Probation noted that, as an adult, Mr. Davalos has battled with homelessness, mental illness, and substance abuse.[2] (PSR at 18.) Probation also recognized his lesser culpability as a "lookout" relative to his co-conspirators. (PSR at 18.)

Probation further highlighted that, as described above, Mr. Davalos has taken substantial steps to turn his life around. As Probation described, Mr. Davalos's "positive adjustment to Pretrial Supervision indicates that he has the ability to maintain employment and earn an honest living. He has been compliant with the conditions of his pretrial supervision, and apparently sober. These positive developments are suggestive that the defendant can overcome his negative issues and succeed." (PSR at 18.)

In light of these considerations, Probation recommended a significant downward variance and a sentence of 24 months' incarceration, to be followed by three years of supervised release.[3]

---

[2]    The PSR incorrectly states that Mr. Davalos is not amenable to drug treatment. (PSR ¶ 55.) Mr. Davalos has received and seeks to continue to receiving substance abuse treatment.

[3]    Probation recommended two special conditions of supervised release to which we object. First, Probation recommends that Mr. Davalos submit to searches of his "computer, other electronic communication, data storage devices, cloud storage or media, and effects." (PSR at 21.) The Court may impose discretionary conditions if they are reasonably related to the nature and circumstances of the offense and the history and characteristics of the defendant. U.S.S.G. § 5D1.3(b). *United States v. Amer*, 110 F.3d 873, 883 (2d Cir. 1997). But the Court may impose special conditions only when they are reasonably related to the factors set forth in 18 U.S.C. § 3553(a), and they involve no greater deprivation of liberty than is reasonably

**United States v. Davalos**
**22 Cr. 45 (PGG)**

(PSR at 18.) We agree with the reasons for Probation's recommended downward variance, but believe that, given the unique circumstances surrounding Mr. Davalos's efforts to reestablish parental rights and the positive momentum he has built with his current mental health, substance abuse, and social services, any period of incarceration risks destroying all the good work Mr. Davalos has done, resulting in the permanent termination of his parental rights. Such an outcome would be far more punitive than necessary to achieve the goals of sentencing.

## VI. The Appropriate Sentence Is Five Years of Probation or Three Years of Supervised Release with Strict Conditions

Notwithstanding Mr. Davalos's lesser relative culpability, the defense recognizes the seriousness of his conduct and that the instinctive reaction might be to impose at least some period of incarceration. But Mr. Davalos is in a unique position right now, with his life at a crossroads. Down one path is Mr. Davalos's continued growth and development, employment, and reunification of his family in permanent housing, all supported by service providers with whom he has established relationships that have proven successful in addressing the root causes of his unlawful conduct. The other path involves incarceration, potential termination of his parental rights, removal of the support systems that have stabilized him, and, when he is released, a restarting of the process of reintegration into society from square one.

The section 3553(a) factors and purposes of sentencing would be much more effectively advanced by a sentence that permits Mr. Davalos to maintain his current positive momentum (including the mental health, substance abuse, and other counseling that has served him well), his employment, and his parental rights. If Mr. Davalos were sentenced to a term of probation or supervised release, he would have continued access to support systems through the Probation

---

necessary. *See* 18 U.S.C. § 3583(d)(1)–(3). The special condition permitting a search of all of Mr. Davalos's electronic devices is not warranted. Such a condition is generally reserved for individuals who have been convicted of sex offenses. *See* U.S.S.G. § 5D1.3(7). Mr. Davalos was convicted of conspiracy to commit Hobbs Act robbery, with no allegations that electronic devices were connected to the offense. Probation has provided no justification for this special condition, which should not be imposed because it is not reasonably related to either his offense or history and involves a deprivation of liberty greater than reasonably necessary. Courts often decline to impose this condition when requested by Probation without justification. *See, e.g.*, *United States v. DeJesus*, 20 Cr. 397 (PGG) (declining to impose electronic search condition when requested by Probation in a fraud case); *United States v. Williams*, 20 Cr. 489 (JMF) (same in possession of ammunition case); *United States v. Porter*, 20 Cr. 459 (RMB) (same); *United States v. Searles*, 19 Cr. 381 (GBD) (same in Hobbs Act robbery case). Similarly, the requested condition that Mr. Davalos not incur new credit charges or open new lines of credit without Probation's approval is unrelated to Mr. Davalos's history or offense conduct and may impede his efforts to establish himself financially and independently. It should not be imposed. (PSR at 21.)

8

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Department (and the assistance of the social work department in the undersigned's office, if needed). Mr. Davalos could be subject to strict conditions of supervision, including ongoing drug tests, substance abuse treatment, mental health treatment, and verifiable employment. The Court could order Mr. Davalos to participate in community service to make partial amends for his misconduct. If Mr. Davalos did not comply with any of these conditions, the Court could re-sentence him up to the relevant statutory maximum periods. Indeed, if the Court were to impose a period of probation (which is an available sentence for Hobbs Act robbery conspiracy, a Class C felony, *see* 18 U.S.C. § 3561(a); PSR at 17) and Mr. Davalos were to violate his conditions, the Court could revoke his probation and resentence him for the underlying offense of conviction. *See* 18 U.S.C. § 3565(a)(2).

A lengthy period of probation or supervised release would be no small punishment. As the Second Circuit has noted, "supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty." *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018). Such a sentence would also reflect the unique aspects of this man that call for mercy.

### A. *The Court Has Broad Discretion To Determine the Appropriate Sentence*

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). As the Second Circuit has explained, if the District Court believes a lower sentence will be as effective as a higher sentence in advancing the purposes of sentencing, "it must choose the lower sentence." *United States v. Pugh*, 945 F.3d 9, 28 (2d Cir. 2019) (citing *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006)). In determining the proper sentence to impose, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

### B. *The Section 3553(a) Factors Support A Lengthy Sentence of Probation or Supervised Release with Strict Conditions*

For this individual in this case, the section 3553(a) factors favor a sentence that will punish Mr. Davalos (by imposing numerous restrictions on his liberty for a prolonged period of time) while accounting for his unique vulnerabilities and the progress he has made in establishing himself as a stable, productive, and law-abiding member of society. Specifically, a sentence of the maximum term of probation or supervised release, with strict conditions of compliance including substance abuse treatment and drug testing, mental health treatment, employment requirements, and a period of community service would reflect the seriousness of

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Mr. Davalos's conduct, would promote respect for the law, and would provide just punishment, without subjecting Mr. Davalos to the loss of his parental rights and all the progress he has made in turning his life around. It would also recognize Mr. Davalos's heartbreaking personal history and good characteristics. *See* 18 U.S.C. § 3553(a)(1)–(2).

Perhaps most importantly in this case, section 3553(a)(2)(D) directs the Court to consider how to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." As described at length, Mr. Davalos has made significant, verifiable progress with the mental health, substance abuse, vocational, and social services providers with whom he has worked over the past two years. As his entirely lawful, productive behavior over this time has demonstrated, Mr. Davalos has benefitted immensely from individualized treatment for his mental health issues. Keeping Mr. Davalos connected to this programming, treatment, and employment would be far more effective in advancing section 3553(a)(2)(D)'s goals than sentencing Mr. Davalos to a period of incarceration. While Mr. Davalos may theoretically have access to mental health treatment and programming if incarcerated, in reality, due to budgetary, staffing, overcrowding, and core competency issues, the Bureau of Prisons is ill-equipped to provide Mr. Davalos with the services and treatment that he needs, let alone "in the most effective manner."

Although limited, BOP data show that, "as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's FY 2016 Performance Budget Congressional Submission cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness." Office of the Inspector General, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (July 2017), at ii.[4] In 2006, the United States Department of Justice, Bureau of Justice Statistics, published a report that summarized the lack of mental health treatment in the Bureau of Prisons. *See* Bureau of Justice Statistics, *Special Report: Mental Health Problems of Prison and Jail Inmates* (Dec. 2006).[5] The report showed that 43.6% of males in federal prison have a mental health problem,[6] yet only 15.1% had "professional mental health therapy."[7] The treatment other than therapy that is provided is primarily medication and an overnight hospital stay.[8] According to the report "[t]aking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail."[9]

---

[4]    https://oig.justice.gov/reports/2017/e1705.pdf.

[5]    https://www.bjs.gov/content/pub/pdf/mhppji.pdf

[6]    *Id.* at 4.

[7]    *Id.* at 9.

[8]    *Id.*

[9]    *Id.*

10

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Medication alone, absent a therapeutic environment, is patently insufficient and ineffective in treating underlying psychiatric and psychological conditions giving rise to criminal conduct. The relationship between the therapist and the client, the "therapeutic alliance," is one of the most important factors in treatment success. The type of therapy is not as important as the relationship between the therapist and the patient. *See* J.L. Krupnick et al., *The Role of the Therapeutic Alliance in Psychotherapy and Pharmacotherapy Outcome: Findings in the National Institute of Mental Health Treatment of Depression Collaborative Research Program*, 64 J. OF CONSULT. CLIN. PSYCH. 532 (June 1996).[10] Mr. Davalos currently has such relationships with service providers who have helped him immensely to become a productive member of society. If incarcerated, however, Mr. Davalos would be deprived of these relationships and would be forced, once released, to restart the therapeutic process all over again.

The overall progress Mr. Davalos has made to date is far from assured after any potential incarceration. Just today, the New York State Comptroller issued a report decrying the performance of the Department of Homeless Services, concluding that "there is limited assurance that clients were being placed in and/or transferred to a shelter that could best provide the services necessary to help the individual move forward to permanent housing, independent living, or further treatment in a more appropriate setting if necessary." Office of the N.Y.S. Comptroller, *New York City Dep't of Social Services, Oversight of Shelter Placements* (Dec. 2022).[11] If Mr. Davalos were incarcerated and forced to restart his shelter placement and housing search from the beginning upon his release, there is a significant probability that he will be misplaced, unassisted, or otherwise fall through the cracks of an overburdened shelter system.

Similarly, as courts in this District have recognized, the BOP is currently buffeted by the aftereffects of COVID and related staffing shortages that have significantly reduced, if not eliminated, already meager rehabilitative and counseling services. *See, e.g.*, *United States v. Nelson*, 20 Cr. 3 (KPF) (S.D.N.Y. Nov. 1, 2021), Tr. 39:12–19, 39–25–40:3 (recognizing that BOP facilities are "still processing the effects of the pandemic and their consequent effects on programming" and, as a result, many inmates are "not doing anything other than" being "warehoused" during their time); *see also* E. Ortiz, "Staffing Shortages and Deficient Training Leave First Step Act Floundering, Federal Prison Employees Say," NBCNews (July 28, 2022) (describing how programming at BOP facilities has been severely cut back while employees are diverted to other correctional officer duties during ongoing staffing shortages).[12]

As Judge Failla described in imposing a significant downward variance at a recent sentencing:

---

[10]   https://pubmed.ncbi.nlm.nih.gov/8698947/ (last visited Nov. 30, 2022).

[11]   https://www.osc.state.ny.us/files/state-agencies/audits/pdf/sga-2023-21n5.pdf.

[12]   https://www.nbcnews.com/news/us-news/staffing-shortages-deficient-training-leave-first-step-act-floundering-rcna40210 (last visited Nov. 30, 2022).

**United States v. Davalos**
**22 Cr. 45 (PGG)**

[T]he current state of the prison system is such that a lot of the programs that are most helpful to folks in your situation are not or may not be given in the designated facilities. And so the idea of sending you away for more than 25 months to a place with no programming, no treatment, and just incapacitation causes me concern that any gains that you may have made in this pretrial release stage of your proceedings would have eroded. *United States v. Nelson*, 20 Cr. 3 (KPF) (S.D.N.Y. Nov. 1, 2021), Tr. 17:17–24.

"The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison. . . . [T]he prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise." *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016). In imposing sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), but it must also recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582.

The Government might argue for a Guidelines or near-Guidelines sentence in order to promote deterrence. No term of incarceration is necessary for specific deterrence in this case. Mr. Davalos is deeply ashamed of his conduct and lives every day with remorse and the fear that his actions might cost him the chance to reunite with his daughter. Indeed, a program of probation or supervision with strict conditions, with the additional motivation of reuniting with his daughter and the knowledge that any non-compliance might result in resentencing and the loss of his parental rights, would do more to specifically deter Mr. Davalos from any future misconduct than incarceration. If Mr. Davalos were to be incarcerated, he would be losing everything he has worked so hard to rebuild over the past two years. The most meaningful things in his life are currently hanging in the balance; he will not do anything to jeopardize them.

As to general deterrence, Sentencing Commission member and former-Judge Gleeson has recognized that this is "a phenomenon that is notoriously difficult (and perhaps impossible) to measure." *United States v. Brady*, 02 Cr. 1043 (JG), 2004 WL 86414, at *9 (E.D.N.Y. Jan. 20, 2004). Judge Rakoff has similarly remarked that determining how much deterrence is achieved by a certain amount incarceration is "largely a matter of guesswork, or of taking account of the other factors other than general deterrence." *United States v. Casperson*, 16 Cr. 414 (JSR) (S.D.N.Y. Nov. 4, 2016). Because "determinations regarding general deterrence may be highly subjective, [the Court] must be careful that the individual defendant is not lost in a stereotype." *United States v. Cavera*, 550 F.3d 180, 223 (2d Cir. 2008) (Sotomayor, J., concurring in part).

Section 3553(a)(6) also instructs the Court to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In the Second Circuit in Fiscal Year 2021, more than 81% of defendants convicted of robbery received variances from their Guidelines range, with only 14.3% of defendants receiving a sentence

12

**United States v. Davalos**
**22 Cr. 45 (PGG)**

within the applicable Guidelines range. *See* U.S. Sent'g Comm'n, *Statistical Information Packet Fiscal Year 2021: Second Circuit*, at Tbl. 10 ("Sentence Imposed Relative to the Guideline Range by Type of Crime").[13]

Indeed, other courts faced with similarly situated defendants who had made significant progress in their rehabilitation have sentenced these defendants to non-incarceratory sentences, in recognition of demonstrable efforts to address underlying causes of unlawful conduct and become productive members of society. For example, Judge Wood recently sentenced a defendant who was convicted of Hobbs Act robbery conspiracy for personally attempting to rob a restaurant with a firearm, then successfully robbing a nail salon and three patrons with a firearm. *See* Doc. 66 at 1, *United States v. Young*, 20 Cr. 201 (KMW). The defendant's advisory Guidelines range was 92 to 115 months' incarceration based on a much more significant history of criminal conduct than presented here.

But as the Government, Probation, and Judge Wood recognized, Mr. Young's conduct had been motivated by addiction issues that he was addressing through treatment and counseling. Mr. Young had a lengthy period of pretrial supervision, during which he performed exceptionally, securing employment and supporting his loved ones. As the Government noted in its sentencing submission, although Mr. Young "tried to or did take money, albeit only a total of $37, from innocent individuals at gun point," his prior and instant offense conduct were motivated by addiction, and Mr. Young, during his 19 months on pretrial supervision, had taken "meaningful positive steps" to better himself, including by receiving treatment and testing negative for illegal substances. Doc. 66 at 3, *United States v. Young*, 20 Cr. 201 (KMW).

Recognizing that Mr. Young had taken money from innocent individuals at gunpoint and that this was a serious offense, Judge Wood nonetheless highlighted Mr. Young's "remarkable rehabilitative progress." Doc. 70, *United States v. Young*, 20 Cr. 201 (KMW), Tr. at 21:2–11, 13–15. Judge Wood also noted that Mr. Young's ongoing employment, substance abuse treatment, and negative drug tests reflected that he was "well on [his] way to rehabilitation and that [he'd] been individually deterred from future criminal conduct and that [he was] not a danger to the community." *Id.* 21:24–22:3. Given Mr. Young's exceptional performance on pretrial release and his demonstrable rehabilitation and progress with his service providers in the community, Judge Wood sentenced him to five years of probation, with six months of home confinement. *Id.* at 22:19–23:18.[14]

---

[13]  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/nys21.pdf.

[14]  Mr. Young had been incarcerated pretrial for several months before being released on bail.

**United States v. Davalos**
**22 Cr. 45 (PGG)**

The same considerations that motivated Judge Wood to impose a sentence of probation in a more serious Hobbs Act robbery conspiracy case counsel in favor of a similar sentence here.[15] As the Court recognized at the change of plea hearing, like Mr. Young, Mr. Davalos's flawless performance on pretrial supervision and his successful completion of a rigorous set of counseling, drug testing, and mental health treatment have demonstrated that he does not present a risk of flight or danger to the community. Like Mr. Young, Mr. Davalos has taken remarkable steps in his rehabilitation, including by addressing his mental health and substance abuse issues head-on. Like Mr. Young, Mr. Davalos plays a crucial role in the lives of his family, particularly his almost four-year old daughter, with whom he is desperate to reunite. And like Mr. Young, incarceration would jeopardize all of these positive gains for no benefit to Mr. Davalos or society.[16]

## VII.    Conclusion

Mr. Davalos is deeply remorseful for and ashamed of his conduct. But even before he was charged in this case, Mr. Davalos had started the difficult work of turning his life around, ceasing drug use, receiving mental health treatment, working, and bettering himself as a person and a parent in order to reunite with his daughter. While he stands ready to receive his sentence, we respectfully urge the Court to take into consideration, while formulating the sentence to impose, Mr. Davalos's difficult childhood, the mental health crises he was experiencing at the time of the offense conduct, his sincere efforts to turn his life around since then, and the progress he's made towards reuniting his family. A lengthy term of incarceration here would cause Mr. Davalos to lose all that he has worked so hard for, including the ability to reunite with his daughter. Such a punishment would be far greater than necessary for this defendant in this case.

---

[15]  Home detention or incarceration is not a feasible condition of probation or supervised release given the rules of Mr. Davalos's current shelter, which require him to leave the building every day for certain hours. However, as with his pretrial release conditions, a curfew could be accommodated, if the Court deemed it necessary.

[16]  The Court should not impose any fine given Mr. Davalos's inability to pay any fine. Section 5E1.2(a) of the Sentencing Guidelines provides that a District Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Probation recommends that the fine in this case be waived. (PSR ¶ 67.). *See also United States v. Wong*, 40 F.3d 1347, 1383 (2d Cir.1994) (noting that a defendant's indigence may be "satisfied either by independent evidence or by reference to the defendant's presentence report").

**United States v. Davalos**
**22 Cr. 45 (PGG)**

Accordingly, we respectfully request that the Court sentence Mr. Davalos to probation or supervised release with strict conditions of compliance to help ensure his continued progress, positive momentum, and family reunification.[17] We thank the Court for its consideration.

Respectfully submitted,

/s/ Neil Kelly

Neil P. Kelly
Assistant Federal Defender
(212) 417-8744

cc:    AUSA Mitzi Steiner

---

[17] If the Court imposes any incarceration, we respectfully request that Mr. Davalos be permitted to self-report to his facility once it is designated by the BOP, rather than being taken into custody and housed at MDC Brooklyn. As Probation recognized, Mr. Davalos is a good candidate for voluntary surrender because he has kept all of his court appearances, has been in complete compliance with the conditions of his pretrial release, and is not a flight risk or danger to the community. (PSR at 24.) The Court similarly found, at Mr. Davalos's plea hearing, that there was "clear and convincing evidence here that Mr. Davalos does not present a danger to the community or a risk of flight," particularly in light of "his behavior and conduct over the [more than] 11 months" of this case, and allowed Mr. Davalos to remain out on bail pending sentencing. (Doc. 34, Tr. 22:23–23:1.) These same reasons justify allowing Mr. Davalos to remain on bail on his current conditions and he should be permitted to report to his designated facility. *Cf., In re McGrath*, 21 Mag. 5058 (PED) (S.D.N.Y. Dec. 15, 2021) (recognizing defendant's "flawless compliance with strict bail conditions—including home incarceration—over a seven month period" as a reason to deny government's request for remand pending certification of extraditability).

We also note that the conditions at MDC Brooklyn remain abysmal—with extensive lockdowns and lock-ins due to security incidents and staffing shortages, and a dearth of rehabilitative and restorative services, programming, and counseling. There is no compelling need to introduce yet another person to this facility while Mr. Davalos awaits designation.